CLAIBORNE *v.* SOLOMON *et al.*

(*Knoxville*, September Term, 1948.)

Opinion filed December 11, 1948.

POORE, COX, BAKER & MCAULEY, of Knoxville, for plaintiff.

CREEKMORE & BUHL, of Knoxville, for defendants.

MR. JUSTICE BURNETT delivered the opinion of the Court.

This is a suit by a pedestrian, Ruth Claiborne, against the driver of an automobile for injuries received when she was struck while crossing a city street on a marked crosswalk. The jury found in favor of the defendant. On appeal in error the Court of Appeals reversed and remanded the case. We granted *certiorari* because the two courts differed on a law question, only, which is of importance.

From the opinion of the Court of Appeals we quote certain excerpts, which fairly set forth the determinative facts and legal conclusion for the reversal and remand, as follows:

"Plaintiff was struck by the Solomon car about 3:45 P. M., October 6, 1946, while walking across Gay Street in Knoxville from the east to the west side on a cross walk established and marked out by the municipal authorities. The Solomon car was going south along the

westerly side of Gay Street in front of Miller's Store approaching the intersection of Gay Street and Union Avenue. Union Avenue intersects from the west between Miller's Store and the Park National Bank, on the east side of Gay approximately 60 feet further north forming what is referred to by witnesses as a 'jog' or 'dog leg.' For convenience, Union Avenue west of Gay will be referred to as W. Union and that portion of Union Avenue east of Gay as E. Union. The irregularity thus formed and the heavy traffic, both vehicular and pedestrian, at this point, apparently caused the city authorities to establish a cross walk leading from Spence Shoe Company located on the north corner of E. Union Avenue and Gay to Miller's Store on the west side of Gay."

"Four traffic lights were in this area, one at the Bank corner and one on the Miller corner, where W. Union intersects Gay Street, and the other two directly across Gay Street on the East side thereof as if W. Union extended directly across Gay Street.

"Having charged the jury that there were two separate and distinct intersections, the Court went further and charged the jury both in the original charge and in response to the jury's request for further instructions that the traffic lights did not control the movement of traffic either pedestrian or vehicular at the cross walk sixty feet north of the Miller corner though plaintiff's testimony that she was crossing on a green light could be considered in determining whether she was in the exercise of due care.

"Plaintiff testified that before stepping off the curb in front of Spence Shoe Company the light at the Miller corner facing her was red; that she waited for a green light and started across the street on the cross walk; that

when she reached a point near the center of the street she passed in front of a truck facing south and parked on the north side of the cross walk; that when she passed beyond the truck the Solomon car struck and felled her to the pavement. There were a number of other pedestrians crossing at the same time some two or three of whom support plaintiff's testimony as to the light being green and the position of the parked truck. Plaintiff says she was watching the light and did not look for traffic from the north before emerging from in front of the truck.

"Miss Watson, accompanied by two other ladies, entered Gay Street from the west one block north of the Union Avenue intersection. She says she was driving at a speed of about ten miles per hour; that the light on the corner of W. Union and Gay facing her was green and continued green until after the collision; that there was no parked truck as related by plaintiff and her witnesses but that she was in a stream of traffic (two or three cars abreast) which continued in motion; that, although she knew that pedestrians crossed between Spence Shoe Store and Miller's, she did not look for persons crossing there and did not see plaintiff until after she heard a noise and stopped her car. One of her companions support her insistence that she was moving on a green light. The other did not notice the traffic lights.

"With the greatest deference to the able trial judge, we think the case hinges not so much on whether there is one intersection or two as upon the question of whether the jury should have been allowed to determine for themselves the question of whether, under all the prevailing circumstances and the peculiarities of location of the cross walk and traffic lights, the driver of a vehicle ap-

proaching from the north should stop at the cross walk upon being confronted with a red light. For the parties here involved the only effect of the existence and peculiar location of the intersection of E. Union and Gay was the location of the cross walk sixty feet north of the intersection of W. Union and Gay instead of immediately north of that intersection. It was not Miss Watson's intention to enter E. Union and, of course, she was not concerned about the movement of north bound traffic controlled by the light for the E. Union intersection. *As we view it, the final and decisive question is whether it can be said as a matter of law that a red light at the W. Union intersection did not control the movement of traffic approaching the intersection from the north at the point sixty feet north of the intersection where the city had established a cross walk for pedestrians.* The learned trial court determined as a matter of law that it did not control though, as noted, the jury were instructed to consider the fact that plaintiff was crossing on a green light in determining whether she was guilty of contributory negligence.''

We have italicized, above, the determinative reason for the decision of the Court of Appeals. We have given the question an unusual amount of thought and independent research because of our regard for the opinion of that court. After thus considering the question we are constrained to disagree with the Court of Appeals and agree with the trial judge.

The plaintiff below relied on certain city ordinances governing ''traffic at an intersection'' which is controlled by ''colored lights''. The trial judge held as a matter of law that these traffic ordinances were not applicable because ''this was an intersection'' ''which was not con-

640

trolled by traffic control lights or a police officer." Obviously the answer to the question is a proper determination of what constitutes an intersection under the physical facts of this case.

■ Ordinarily, the term "intersection" as used in a municipal ordinance regulating traffic, means the space occupied by two streets at the place where they cross each other and to include the whole space between lines of two streets  This would certainly seem the reasonable rule to adopt here.  Even though W. Union did not extend across Gay Street the City authorities had placed lights on the East side of Gay Street directly across from the lines and lights on the W. side of Gay Street where W. Union entered Gay Street.  This then left a considerable space (not exactly shown by the record, but approximately 60 feet) north of the north line of W. Union if extended across Gay Street before the cross walk from E. Union was reached.  The municipality established cross walks at the lights and another some distance north, where the accident happened, where there were no control lights.  It is thus evident that the municipal authorities treated and considered these two distinct intersections, one controlled by traffic lights and the other a pedestrian crossing not controlled by traffic lights.  Vehicular traffic moving south and north was controlled by traffic lights at the intersection of W. Union not E. Union. Thus the space between W. Union and E. Union was outside of the intersection of either of these streets with Gay Street and was in fact a part of Gay Street.

In a similar factual situation the Supreme Court of Errors of Connecticut in the case of *Atwood* v. *Connecticut Co.*, 82 Conn. 539, 74 A. 899, 900, said:

"From the map and finding it appears that in passing from Phoenix avenue to and through Brook street traffic must pass for a distance of more than 19 feet, longitudinally, over a portion of East Main street, no part of which is included within the lines, if produced, of either of the other streets. While so passing through East Main street, it is as effectively outside the limits of Phoenix avenue and Brook street as it would be if the lines of those streets where they join East Main street were a mile apart. Two streets so situated with respect to a third cannot constitute one continuous street intersecting the latter."

Upon these facts the trial court had charged the jury as a matter of law that this space was not a part of the intersection. This charge was held to be correct, there being no dispute as to the factual situation above quoted.

The case now before us was determined by the Court of Appeals in holding that the question, of what a street intersection is, was a question of fact for a jury and not a question of law for the court. If the facts differed as to where the intersection was this would be correct. In the instant case the evidence as to the situation of the streets was undisputed. This being true, the question of whether or not streets were intersecting at that place was a question of law for the court. 10 Blashfield, Cyclopedia of Automobile Law and Practice, Perm Ed., sec. 6606.

Our conclusion, therefore, is that the trial judge was correct in holding as a matter of law that the ordinance offered, governing traffic where the crossing was controlled by traffic lights, did not apply in the instant case.

The point we have had under consideration is not whether the driver of an automobile shall stop his car be-

fore entering an intersection or intersecting street, but is: Was the undisputed point of accident within or in such close proximity to an intersection controlled by lights as to make an ordinance covering such an intersection applicable?

██ ██ It seems to us that the charge of the trial court to the jury was very fair and fully set forth her rights. He charged various sections of the city traffic code relied on by the plaintiff and one section that seems particularly pertinent, to-wit:

"The operator of any vehicle shall yield the right of way to a pedestrian crossing the roadway within any marked crosswalk or within any unmarked crosswalk at the end of a block, except at intersections where the movement of traffic is being regulated by police officers or traffic control signals, or at any point where a pedestrian tunnel or overhead crossing has been provided."

After quoting these traffic Code provisions he told the jury that any "violations would be negligence per se, . . . that is, in and of itself, etc." We quote the following excerpts from the charge which seem very fair and to correctly state the law applicable:

"It is the duty of the driver of a vehicle approaching the crossing of a street intersection to be alert, to have his or her vehicle under control, to drive at a reasonable rate of speed, and to observe what is on the street ahead, so said driver can stop on the shortest possible notice; and the failure to observe this rule might constitute negligence, or contributory negligence.

"A pedestrian having equal rights with others to use the streets must exercise ordinary care for his own safety, to be measured by the situation confronting him such as the immediate circumstances of place and conditions

demand. There is no imperative rule of law requiring the pedestrian when lawfully using the public highways to be continuously looking and listening to ascertain whether vehicles are approaching.

"It is the duty of the driver of an automobile—and was the duty of the driver defendant in this case—to drive her automobile at such a speed and under such control as to be able to stop her car so as to be able to avoid colliding with any obstruction, moving or stationary, that might confront her on the highway, and if the driver of the automobile fails to employ proper speed, or keep her car under proper control so as to avoid such collision, then such driver would be guilty of negligence; and if there was any such negligence on the driver's part, and the part of the defendant in this case, and such negligence was the proximate cause of the plaintiff's injuries, then the defendant would be guilty of negligence, and liable therefor.

"The Court instructs the jury the plaintiff had a right to cross the street in the crosswalk which had been marked out by the city for pedestrians; in so crossing, she had a right to cross the path of vehicles using the street. The crosswalk was not controlled by traffic lights or an officer; but at all times the plaintiff had the duty to exercise due care for her own safety. Whether or not she did, is for the jury to say."

These general propositions were again charged in answering questions propounded by the jury.

The plaintiff takes the position that she had the right of way under the ordinance above quoted (this is correct) and that having the right of way she could proceed across this busy street without looking to the right or left and that if she was hit in thus proceeding she is entitled to

recover. "This right of way, however, is not an inflexible right, and whenever danger may reasonably be anticipated from its exercise, the general duty of due care must still be observed." 2. Blashfield, Cyclopedia of Automobile Law and Practice, Perm. Ed., 1948 Pocket Part., sec. 1242.

The question in such a case is:

Did the pedestrian use that degree of care for her own safety which an ordinarily prudent person would use in the same place and under the same conditions? This is a question of fact for the jury. The same question worded to apply to the motorist might be asked and it must receive the same answer.

On page 19 of respondents reply brief, after saying that the Court of Appeals was correct, it is said:

"We respectfully insist that our Assignment Nos. I, II, V," (through XXIX) "made in the Court of Appeals were all sufficient grounds for a reversal and remanding of the case." Then follows 50 pages setting out these various assignments and arguments thereon. We have carefully considered each of these assignments and cannot find prejudicial error in any of them when taken in light of the record. Twenty of these twenty-six assignments are directed to excerpts from the charge of the court to the jury. The XXIX assignment is directed to the charge as a whole as being "too long, too involved and too complicated."

We have read and reread this charge. It is fair, full and complete. Its length was increased by an inquisitive jury who apparently wanted to be sure they understood the law of the case before reaching a conclusion. The law was correctly expounded to them. There is no

error in this charge, taking it as a whole. No isolated portion is erroneous under the facts of this record.

■ Assignment XXVIII complained of the failure of the trial judge to charge a special request as follows:

"The truck could have stopped in to yield the right of way to pedestrians then lawfully crossing the street, and if there was such a truck this would have been notice that people as pedestrians might be crossing the street." This request was properly refused. It would have been error to give the request as worded. It, in effect, is telling the jury that if a truck had stopped short of this cross walk that then the purpose of so stopping was to allow the plaintiff to cross in front of it. This is not the prerogative of the court—it is a province of the jury to infer or say why a truck stopped, under the facts presented to them. The trial court correctly charged the jury on this phase of the case.

■ Assignments I and II are that the evidence preponderates against the verdict and that there is no evidence to support the verdict. Suffice it to say that the evidence here was sharply in conflict—the defendants evidence tending to show that the plaintiff walked into the side of her car.

■■ Number V is directed to the failure of the trial judge to declare a mistrial because a juror made a comment, as to certain testimony of a witness, that it sounded impossible. No motion was made for a mistrial. The trial judge correctly instructed the jury at the time that they should not comment on the evidence. This witness was not an eye witness but one who saw the plaintiff on the street after the accident. Under such circumstances no harm was done, and too, the plaintiff waived any rights she might have by proceeding with the trial and not

raising the question until after the jury had decided the case against her.

Number VI asserts that the trial court erred in not declaring a mistrial when the jury were apparently in disagreement and by what he said to them he more or less forced them to agree.

After deliberation for some time the jury reported they were ''hopelessly tied,'' and stood ''eight to four.'' Then it was the trial court said:

''Is there anything, gentlemen, that the Court can do? We all dislike mistrials. The Court does not want to force anybody, and does not do it, but we always think, when reasonable men cannot reconcile their differences— What is the question that is bothering you? The question of negligence?

''Foreman: Yes, sir.''

We can see nothing wrong or improper in this action. The action of the court was proper under the circumstances.

For the reasons given herein, the judgment of the Court of Appeals is reversed and that of the trial court affirmed.

All concur.